# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2300-22

NEW JERSEY DIVISION OF
CHILD PROTECTION AND
PERMANENCY,

      Plaintiff-Respondent,

v.

C.S.R.,

      Defendant-Appellant,

and

T.D.,

      Defendant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF S.C.R.,
a minor.

_____

Submitted January 8, 2024 – Decided January 25, 2024

Before Judges Mawla and Marczyk.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Mercer County, Docket No. FG-11-0017-22.

Joseph E. Krakora, Public Defender, attorney for appellant (Steven Edward Miklosey, Designated Counsel, on the brief).

Matthew J. Platkin, Attorney General, attorney for respondent (Janet Greenberg Cohen, Assistant Attorney General, of counsel; Adam Robert Meisle, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minor (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Jennifer Marie Sullivan, Assistant Deputy Public Defender, of counsel and on the brief).

PER CURIAM

Defendant C.S.R. ("Casey") appeals from the Family Part's March 14, 2023 judgment terminating her parental rights to S.C.R. ("Samuel").[1] Casey challenges the court's decision regarding the second part of the third and the fourth prong under N.J.S.A. 30:4C-15.1. The Division of Child Protection and Permanency ("Division") and the Law Guardian contend the judgment is

---

[1] We refer to the parties, child, and other family members involved in this case using either initials or pseudonyms to protect their privacy and the confidentiality of these proceedings. R. 1:38-3(d)(12).

supported by substantial, credible evidence in the record.  Having considered the arguments in light of the record and applicable legal standards, we affirm.

## I.

Casey is the biological mother of Samuel who was born in October 2012.[2] Samuel has two maternal siblings, an adult sister I.J., and a fourteen-year-old brother X.C., who lives with his father.

In October 2017, the Division received its first referral regarding Casey's care of Samuel due to allegations of physical abuse, substance abuse, and domestic violence that resulted in Samuel sustaining a broken femur.  These allegations were unfounded.[3]  In February 2019, the Division received another referral from a healthcare facility because Casey, while under the influence, took Samuel to the emergency room for a rash.  Specifically, the referral explained Samuel informed the doctor "his father hit him on his arm . . . [and] in the abdomen."  Additionally, Casey appeared to be intoxicated after going to the restroom, when she came back "with an unsteady gait and slurred speech . . . ."

---

[2]  T.D. is Samuel's biological father.  He rarely participated in the FN or FG proceedings.  He entered a voluntary surrender of his parental rights a day before the guardianship trial.  He is not a party to this appeal.

[3]  The Division had prior involvement with Casey involving I.J. dating back to 2005.

A-2300-22

Casey asserted she was prescribed Percocet, Zanaflex, and Ambien. She was referred to the Child Protection Substance Abuse Initiative. She was dismissed for non-compliance. Ultimately, the allegations of abuse were not established.

In July 2020, the Division was again contacted concerning Casey's care of Samuel. The reporter, who was a close family friend, was concerned for Samuel's safety. Casey was ultimately substantiated for neglect due to inadequate supervision. It was alleged Casey locked Samuel out of the house to use substances, and her boyfriend choked him during a domestic violence incident. The reporter also indicated Samuel was making inappropriate TikTok videos. He was depicted "holding knives such as butcher knives and a cleaver knife [and putting] the knife to his neck like he is slitting his neck . . . ." When a Division worker went to the residence to investigate, a woman who matched Casey's description, but denied being Casey, answered the door and refused the worker entry. The worker left, called the police, and returned to the home, where she met with the police who were investigating a different matter involving Samuel. Samuel, then aged seven, was allegedly part of a burglary of a neighboring home. The worker attempted to speak with Casey again, and she said, "I don't fuck with [the Division] and I don't fuck with the police[,]" and she walked away.

4

During this interaction, the Division worker noticed "a cut on [Samuel's] right eyelid, an abrasion to the right side of his forehead[,] and bruising under both eyes." EMTs were called to the scene and suggested Samuel be taken to the hospital to have his injuries documented and evaluated. The Division worker accompanied Samuel to the hospital, but Casey did not go, nor did she inquire about his condition when at the hospital. When the Division worker asked about what led to Samuel's injuries, he explained, "[M]om didn't punch me in the face but she told me not to tell how I got them." Because Casey did not go to the hospital, the Division took emergency custody of Samuel to consent to his medical care. The Division thereafter conducted an emergency removal.

Samuel was evaluated at the Dorothy B. Hersh Regional Child Protection Center on July 31, 2020. When the child abuse pediatrician asked Samuel about the injuries to his face, he responded, "[m]y mother didn't hit me. Fat Boy hit me with a remote." The pediatrician determined the injuries neither confirmed nor denied the possibility of abuse and recommended Samuel undergo a psychological evaluation. In August 2020, Casey denied the domestic violence allegations and physical discipline allegations.

Following Samuel's emergent removal from Casey's care, he was placed in a non-relative resource home while the Division assessed numerous potential

5

placements with his relatives.[4] His father T.D. advised the Division he did not want to be involved in Samuel's care because of Casey's erratic behavior and his own legal problems. The Division ruled out Samuel's cousin D.D. and family friend E.K.C. because neither were able to care for him. Although Samuel's grandmother J.T. ("Jenny") was able to care for Samuel for a period of time, she eventually advised she could not care for Samuel due to her declining health, Samuel's behavior, and concerns about dealing with Casey. Samuel's maternal grandfather R.R. did not respond to the Division's inquiries. Casey did not provide the names of any other potential family members who could care for Samuel. Samuel's step-maternal grandfather B.J. was later determined to be unable to care for him. The Division also subsequently explored Samuel's maternal aunt K.T. and again followed up with his maternal grandfather R.R., however, both were ruled out as neither was able to care for Samuel. Lastly, Samuel's "godfather" R.T. was ruled out due to an ASFA disqualifier.[5]

---

[4] Specifically, Samuel was removed due to Casey's inadequate supervision based on (1) the TikTok videos of Samuel with knives and flashing gang signs, (2) the alleged burglary that Samuel was involved in on July 28, 2020, and (3) Casey leaving the scene while Samuel received medical care for his injuries observed by the Division worker.

[5] ASFA is an acronym for the federal "Adoption and Safe Families Act of 1997," adopted by Congress in 1997. N.J. Div. of Child Prot. & Permanency v. T.S.,

6

When Samuel was first removed, he was delayed academically because he had missed a significant amount of school. While Samuel should have been in the third grade, he was placed into first grade special education because he did not know how to read, write, or do basic math. Samuel made significant academic progress despite lingering behavioral issues after he began attending school regularly. Moreover, after entering placement, Samuel began to recount violent incidents in or around Casey's home. On one occasion, he stated he saw his "dad" hitting Casey.[6] On another occasion, Samuel witnessed Casey and a paramour having sexual relations, which prompted the paramour to throw Samuel against a wall, before Casey told Samuel to stop crying and began choking him.

On May 11, 2021, Samuel's resource parents requested his removal from

---

463 N.J. Super. 142, 153 n.3 (App. Div. 2020). It "requires a state receiving federal funding to adopt procedures to prohibit persons who have been convicted of child abuse or neglect, spousal abuse, or any crime against children, or for a crime involving violence, from becoming resource parents." Ibid. (citing 42 U.S.C.A. § 671(a)(20)). R.T. also denied he was Samuel's godfather.

[6] Samuel stated to Dr. David Brandwein, Psy.D., that he recalled domestic violence incidents, seeing Casey getting into fights, and him feeling scared. Casey later acknowledged to Dr. Brandwein she had been a victim of domestic violence.

their home due to his behavioral issues. Samuel was placed in a temporary respite home while the Division tried to locate a new resource home, however, Samuel's initial resource parents welcomed him back just over a week later. Nevertheless, in July 2021, Samuel's resource parents again requested his removal because of Samuel's behavior.[7]

When Samuel was again removed from this resource home, Jenny, Samuel's maternal grandmother, advised the caseworker she was willing to be a placement for Samuel, and he was placed with her in August 2021. At first, Jenny expressed a desire to adopt Samuel but soon indicated she was struggling with his behavioral issues and her own health issues.[8] In March 2022, despite Samuel being provided with services, Jenny requested that he be removed from her home.[9]

---

[7] The resource parents indicated Samuel would punch, kick, scratch, and threaten them.

[8] Casey also began to leave hostile voicemails for Jenny, referring to Samuel using racial slurs and stating, "everyone can die a slow death."

[9] In October 2021, Samuel completed a psychological evaluation with Dr. Brandwein. Dr. Brandwein recommended individual therapy and a child study team evaluation. Shortly after Samuel's initial evaluation with Dr. Brandwein, he began receiving twice-weekly therapy and made significant progress.

A-2300-22

In March 2022 Samuel was moved to a new, non-relative resource home where he has resided to the present time. Samuel expressed that his resource parents "love him" and wanted to adopt him. At the resource home, Samuel continued to maintain contact with his biological family. The resource parents confirmed their interest in adopting Samuel as opposed to a kinship legal guardianship ("KLG") in order to avoid dealing with Casey's behavior.

The Division set up visits with Casey immediately following Samuel's removal, which she initially attended on a regular basis. However, the visits were not without issue. Periodically, Samuel told the Division worker that he did not want to attend visits with his mother. For example, he would observe that his mother seemed "strung out or high" and he did not want to see her in that condition. At one visit in March 2021, Samuel indicated, "I'm mad because she did use to beat me. . . . She did choke me. I had red marks on my face." Casey later admitted to a Division worker she had "yoked [Samuel] up by his shirt." After this March 2021 visit, Casey's visits became sporadic.

Casey was referred to Children's Home Society ("CHS") for therapeutic visitation and other services. In May 2021, Casey began therapeutic visits with Samuel through CHS. At the first visit, Samuel recounted how his father would hit him, which Casey denied. Samuel explained: "My mom is not listening to

9

me, and you guys understand. When she doesn't do this for me, I don't want to live with her." Their visits were suspended from May 18 to August 12, when Samuel stabilized in his placement and obtained a behavioral assistant. When visits resumed, Casey missed nearly all of her scheduled visits between August 2021 and February 2022. While Casey's attendance improved from March to May 2022, she stopped visiting thereafter. In November 2022, CHS eventually terminated the therapeutic visitations due to Casey's failure to participate.[10]

Regarding Casey's treatment services, she was scheduled to complete a psychological evaluation in October 2020, but it did not take place until January 2021 because Casey was hospitalized after a domestic violence incident. At the evaluation, Casey reported that she was involved in domestic violence situations and was diagnosed with bipolar disorder, anxiety, and depression. It was recommended that Casey attend parenting classes, substance abuse treatment, individual therapy, a psychiatric examination, therapeutic visitations with Samuel, and obtain routine drug screens. Casey did not complete any of these

---

[10] On December 8, 2022, a Division caseworker attempted to call Casey but was informed by the Atlantic County Jail that she had been arrested on November 24, 2022, for violating a restraining order. She remained incarcerated throughout the guardianship trial.

services. Casey refused to complete the MICA[11] program, failed to attend a bonding evaluation, continuously tested positive for alcohol, and failed to submit to drug screens after March 2021.

The three-day guardianship trial was held in January 2023. The Division presented testimony from Division intake worker Erin Kelly, adoption worker Wanda Hernandez, casework supervisor Debra Gomez, Dr. Brandwein, and social worker Nicole Kries-Wyszynski. Casey testified on her own behalf, but she did not call any witnesses.[12] The Law Guardian also did not call any witnesses but joined the Division's request for termination of Casey's parental rights followed by resource parent adoption.

Kelly testified Casey had been involved with the Division dating back to 2005. She also testified that there were no family placements able to accept Samuel when he was removed from Casey's care.[13] Kelly explained that Samuel confided in her about the TikTok videos that showed Samuel holding knives,

---

[11] This program provides mental health and substance abuse treatment.

[12] The court noted Casey had been incarcerated in the Atlantic County Detention Center from November 24, 2022, until the time of trial and entered a writ, ensuring her attendance at trial.

[13] Gomez confirmed there were no previously explored relatives that had sought to be reassessed as potential caregivers for Samuel.

A-2300-22

and he told her that Casey filmed the video for him. She also discussed the police records she obtained concerning domestic violence incidents in 2017 when Casey's paramour broke her jaw and 2020 when the paramour poured boiling water on her.

Hernandez testified regarding Casey's inconsistent visits with Samuel and Samuel's eventual request to end visitation in November 2022, due to Casey's failure to appear for visits. She further stated Samuel loved his resource parents, thrived in their care, and wished to be adopted by them. Hernandez also testified that the resource parents were advised about the difference between KLG and adoption multiple times and that they executed the Division's "KLG v. Adoption" form. The resource parents were steadfast in their desire to adopt and did not want a KLG.

Kries-Wyszynski testified that bonding evaluations between Samuel and Casey could not be completed because Casey did not show up on two occasions. While waiting at one of the evaluations Casey missed, Kries-Wyszynski testified she observed the resource parents' interactions with Samuel and noted they verbalized their intention to maintain Samuel's contact with the biological family in the future. Samuel also told Kries-Wyszynski that he believed his mother loved him but was not capable of taking care of him.

A-2300-22

Dr. Brandwein, an expert in psychology, testified about his evaluations of Casey and Samuel. Dr. Brandwein testified that he believed Casey was under the influence of a "sedative" and aborted her testing "due to concerns about the validity of it." Overall, Dr. Brandwein found Casey unwilling to engage in the necessary services to manage her mental health and unable to explain why Samuel was removed from her care. He testified Casey could not be an independent caretaker for Samuel.

Regarding Samuel, Dr. Brandwein testified he suffered from anger issues, poor focus, and hyperactivity. Dr. Brandwein explained that Samuel had some good memories with his mother but remembered various incidents of domestic violence in the home. At the time of the evaluation, Samuel told Dr. Brandwein that he would go back to his mother if certain conditions were satisfied, such as the elimination of domestic violence.

Casey testified she was willing to enter an inpatient mental health facility. Additionally, Casey testified about her willingness to consent to a KLG. Casey indicated that she was currently incarcerated for violating a restraining order. She claimed that she as unaware of why Samuel was removed from her care. Casey could not recall incidents of domestic violence and denied having a

substance abuse problem. She conceded her paramours had hit Samuel in the past, but she denied choking him.

The court found all the Division witnesses to be credible. It noted they were "forthright, candid, and sincere when they testified on direct and cross-examination. Although they all relied on the documentary evidence to refresh their memories, on the whole their recollection of events were good." Moreover, the court stated, "the Division's witnesses gave testimony that [was] reasonable and made logical sense. Their demeanors were pleasant and cooperative." The court noted that the "inconsistencies were minor and of no consequence to the overall believability of their testimony."

On the other hand, the court did not find Casey to be a credible witness. "Her testimony was self-serving and evasive. Her demeanor was guarded and suspicious especially when she testified that she could not recall critical facts, especially to those questions concerning domestic violence in which she . . . [was a] victim[]."

On March 14, 2023, the trial court issued a well-reasoned and comprehensive sixty-four-page written decision, discussed more fully below, finding the Division met its burden of proof as to all four prongs under N.J.S.A.

14

30:4C-15.1, by clear and convincing evidence. The court entered a judgment of guardianship terminating Casey's parental rights to Samuel.

## II.

Casey raises the following issues on appeal:

POINT I

[KLG] WAS A VIABLE OPTION WITH THE CURRENT RESOURCE PARENTS, BUT WAS NOT PURSUED SINCE THE RESOURCE PARENTS PREFERRED ADOPTION.

POINT II

TERMINATION OF PARENTAL RIGHTS ["TPR"] WOULD DO MORE HARM THAN GOOD BECAUSE TERMINATION WILL SEVER SAMUEL'S RELATIONSHIP WITH HIS FAMILY DESPITE HIS CONSISTENT EXPRESSED DESIRE TO MAINTAIN RELATIONSHIPS WITH HIS BIOLOGICAL FAMILY.

More particularly, as to the second part of prong three, Casey argues the court found TPR was the only viable option because the resource parents desired adoption. That is, the court allowed the preferences of the resource parents to become "the determinative factor in whether KLG, as opposed to adoption, was in Samuel's best interest." Casey further relies on the 2021 amendments to N.J.S.A. 30:4C-15.1(a) for the proposition that "[k]inship care is the preferred resource for children who must be removed from their birth parents because use

of kinship care maintains children's connections with their families" and that parental rights must be preserved whenever possible.  L. 2021, c. 154, § 1.

Casey next contends, with respect to prong four, the trial judge did not consider Samuel's biological family relationships, whereas the judge that presided over the majority of the FG proceedings recognized "that Samuel wanted his mother and the rest of his family to remain in his life . . . ."  Casey further argues that Samuel wanted to have visits with his grandmother and siblings, despite requesting visitation with his mother be suspended during this litigation.  Casey also reiterates that a KLG arrangement would have preserved Samuel's contacts with his family, and the court simply accepted the resource parents' request against a KLG in favor of adoption.

Our scope of review in appeals from orders terminating parental rights is limited.  N.J. Div. of Child Prot. & Permanency v. T.D., 454 N.J. Super. 353, 379 (App. Div. 2018).  "[W]e apply a deferential standard in reviewing the family court's findings of fact because of its superior position to judge the credibility of witnesses and weigh the evidence[.]"  N.J. Div. of Child Prot. & Permanency v. J.R.-R., 248 N.J. 353, 368 (2021) (internal citations omitted).  In such cases, we will generally uphold the trial court's findings, so long as they are supported by "adequate, substantial, and credible evidence."  N.J. Div. of

Youth & Fam. Servs. v. R.G., 217 N.J. 527, 552 (2014); see N.J. Div. of Youth & Fam. Servs. v. F.M., 211 N.J. 420, 448-49 (2012) ("It is not our place to second-guess or substitute our judgment for that of the family court, provided that the record contains substantial and credible evidence to support the decision to terminate parental rights."). Such a decision should only be reversed or altered on appeal if the trial court's findings were "so wholly unsupportable as to result in a denial of justice." N.J. Div. of Youth & Fam. Servs. v. P.P., 180 N.J. 494, 511 (2004) (quoting In re Guardianship of J.N.H., 172 N.J. 440, 472 (2002)).

"We accord deference to factfindings of the family court because it has the superior ability to gauge the credibility of the witnesses who testify before it and because it possesses special expertise in matters related to the family." F.M., 211 N.J. at 448 (citing Cesare v. Cesare, 154 N.J. 394, 413 (1998)). Even where the parent alleges "error in the trial judge's evaluation of the underlying facts and the implications to be drawn therefrom," deference must be afforded unless the judge "went so wide of the mark that a mistake must have been made." N.J. Div. of Youth & Fam. Servs. v. M.M., 189 N.J. 261, 279 (2007) (first quoting In re Guardianship of J.T., 269 N.J. Super. 172, 188-89 (App. Div.

1993); then quoting C.B. Snyder Realty, Inc. v. BMW of N. Am. Inc., 233 N.J. Super. 65, 69 (App. Div. 1989)).

When the State seeks to terminate parental rights, the Division must prove by clear and convincing evidence each of the following:

> (1)    The child's safety, health, or development has been or will continue to be endangered by the parental relationship;
>
> (2)    The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm;
>
> (3)    The [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to [TPR]; and
>
> (4)    [TPR] will not do more harm than good.
>
> [N.J.S.A. 30:4C-15.1(a).]

Importantly, these fact-sensitive factors "overlap with one another to provide a comprehensive standard that identifies a child's best interests." N.J. Div. of Youth & Fam. Servs. v. G.L., 191 N.J. 596, 606-07 (2007) (quoting In re Guardianship of K.H.O., 161 N.J. 337, 348 (1999)).

Although Casey only challenges the court's holding as to the second part of prong three and the court's evaluation of prong four, we address the other

factors addressed by the court because the prongs are interconnected in determining what constitutes the child's best interest. This will provide context for the court's findings concerning the prongs contested by Casey.

A.

"The first two prongs [of] N.J.S.A. 30:4C-15.1(a) . . . are 'the two components of the harm requirement' and 'are related to one another.'" T.D., 454 N.J. Super. at 380 (quoting In re Guardianship of DMH, 161 N.J. 365, 379 (1999)). "Therefore, 'evidence that supports one informs and may support the other as part of the comprehensive basis for determining the best interests of the child.'" Ibid. Under the first prong, "the Division must prove harm that 'threatens the child's health and will likely have continuing deleterious effects on the child.'" N.J. Div. of Youth & Fam. Servs. v. A.L., 213 N.J. 1, 25 (2013) (quoting K.H.O., 161 N.J. at 352). Under prong two, "the inquiry centers on whether the parent is able to remove the danger facing the child." F.M., 211 N.J. at 451 (citing K.H.O., 161 N.J. at 352). Prong two may be proven by "indications of parental dereliction and irresponsibility, such as the parent's continued or recurrent drug abuse, [and] the inability to provide a stable and protective home . . . ." K.H.O., 161 N.J. at 353. See also N.J. Div. of Youth & Fam. Servs. v. B.G.S., 291 N.J. Super. 582, 592 (App. Div. 1996) (finding the

19

"inability or unwillingness to resolve the problems with respect to . . . mental health and substance abuse" satisfies the second prong).

As to prong one, Casey does not dispute her conduct—which prompted the removal—endangered Samuel's health and wellbeing. Specifically, the court found Casey exposed Samuel to domestic violence in the home with her intimate partners and that Samuel himself faced abuse from her paramours. She further assisted Samuel in making a TikTok video playing with knives and simulating slitting his throat. She further inadequately supervised him resulting in Samuel's involvement in a burglary as a young child. Lastly, the court determined Casey's untreated mental health and substance abuse impaired her ability to care for her son.

As to the second prong, despite extensive efforts and services provided by the Division, the court held that Casey had not been able to remedy her serious issues that significantly impaired her ability to be a parent. Not only did she fail to take advantage of the various therapeutic services, but she did not consistently attend visitation with Samuel and eventually stopped attending several months before trial. She has been either unwilling or unable to eliminate the harm facing Samuel and has been unable to provide him anything resembling a safe and stable home. This, in turn, denied him stability and permanent placement which

added to the harm suffered by Samuel. The court noted that despite the Division's efforts, Casey and Samuel "find themselves in much of the same position, and arguably even a worse position than at the start of this case." Casey also lacked insight into her condition. Her failure or inability to acknowledge her condition affected her capacity to effectively and safely parent. The trial court's decision, in this regard, was well-supported by the record.

B.

The first part of the third prong requires the Division to make "reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home . . . ." N.J.S.A. 30:4C-15.1(a)(3). That provision of the statute "contemplates efforts that focus on reunification of the parent with the child and assistance to the parent to correct and overcome those circumstances that necessitated the placement of the child[.]" K.H.O., 161 N.J. at 354. As discussed above, it is undisputed the Division provided extensive services to help Casey remediate the issues leading to Samuel's removal. Unfortunately, they were unsuccessful.

We now turn to the second part of prong three, which is contested by Casey. That provision requires the court to "consider[] alternatives to [TPR.]" N.J.S.A. 30:4C-15.1(a)(3). Those alternatives may include placement of the

21

child with a relative caretaker, N.J.S.A. 30:4C-12.1(a), or the establishment of a KLG. N.J. Div. of Youth & Fam. Servs. v. L.L., 201 N.J. 210, 222 (2010). As the trial court recognized, in July 2021, the Legislature enacted amendments to various sections of Title 9, governing acts of child abuse and neglect; Title 30, governing TPR proceedings; and Title 3B, governing KLG proceedings. L. 2021, c. 154.[14]

---

[14] The preamble to the amendments provides:

> The Legislature finds and declares that:
>
> a. Foster care is intended by existing state and federal statute to be temporary.
>
> b. Kinship care is the preferred resource for children who must be removed from their birth parents because use of kinship care maintains children's connections with their families. There are many benefits to placing children with relatives or other kinship caregivers, such as increased stability and safety as well as the ability to maintain family connections and cultural traditions.
>
> c. Federal law permits [KLG] arrangements to be used when the child has been in the care of a relative for a period of six months.
>
> d. Parental rights must be protected and preserved wherever possible.
>
> e. Children are capable of forming healthy attachments with multiple caring adults throughout the course of

22

With respect to TPR proceedings, the Legislature amended the second prong of N.J.S.A. 30:4C-15.1(a) to delete its second sentence. L. 2021, c. 154, § 9. The second prong formerly read as follows:

> The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child[.]
>
> [N.J.S.A. 30:4C-15.1(a)(2) (2015) (amended 2021).]

---

> their childhood, including with birth parents, temporary resource parents, extended family members, and other caring adults.
>
> f. The existence of a healthy attachment between a child and the child's resource family parent does not in and of itself preclude the child from maintaining, forming or repairing relationships with the child's parent or caregiver of origin.
>
> g. It is therefore necessary for the Legislature to amend current laws to strengthen support for kinship caregivers, and ensure focus on parents' fitness and the benefits of preserving the birth parent-child relationship, as opposed to considering the impact of severing the child's relationship with the resource family parents.
>
> [L. 2021, c. 154, § 1.]

The amendments also altered the KLG analysis. L. 2021, c. 154, § 4. Prior to 2021, N.J.S.A. 3B:12A-6(d)(3) required a court to find by clear and convincing evidence that adoption was neither feasible nor likely before awarding KLG, rendering KLG unavailable when a caretaker was willing to adopt the child. See N.J. Div. of Youth & Fam. Servs. v. T.I., 423 N.J. Super. 127, 130 (App. Div. 2011) ("[W]hen a caregiver in a case brought by the Division . . . unequivocally asserts a desire to adopt, the finding required [by N.J.S.A. 3B:12A-6(d)(3)] for a KLG that 'adoption of the child is neither feasible nor likely' cannot be met."). The 2021 amendments deleted this language, thereby making KLG an equally available permanency plan for children in Division custody. L. 2021, c. 154, § 4; N.J.S.A. 3B:12A-6(d)(3).

Additionally, the Legislature amended Title 9 to require the Division to "make reasonable efforts" to place children with suitable relatives or kinship caregivers before placing them elsewhere when effectuating an emergency removal. L. 2021, c. 154, § 5 (amending N.J.S.A. 9:6-8.30(a)). It also required judges to "first consider" placement with suitable relatives or kinship caregivers before ordering other placements during Title 9 proceedings. L. 2021, c. 154, §§ 6, 7 (amending N.J.S.A. 9:6-8.31(b) and N.J.S.A. 9:6-8.54(a)). Further, it amended Title 30 to require the Division to consider placement of children with

relatives or kinship caregivers, and to conduct a search for such relatives or kinship caregivers within thirty days of accepting a child into Division custody. L. 2021, c. 154, § 8 (amending N.J.S.A. 30:4C-12.1(a) & (b)).

Based on these amendments, Casey asserts KLG is "expressly favored as the default option when reunification cannot be effectuated" and "it becomes difficult to fathom a set of circumstances where kinship care should ever be rejected in favor of [TPR]." We are unpersuaded by Casey's contentions. Although kinship care is the preferred resource for children removed from their biological parents, the amendments do not override the clear statutory text in cases involving the TPR. Prongs three and four of N.J.S.A. 30:4C-15.1(a) were unaltered by the 2021 amendments. Notwithstanding the Legislature's declaration that "[p]arental rights must be protected and preserved whenever possible[,]" L. 2021, c. 154, § 1, this language cannot be used to substantively alter the otherwise clear directive set forth in prong three that the Division "prove by clear and convincing evidence that 'alternatives to [TPR]' have been appropriately considered." N.J. Div. of Youth & Family Services v. J.S., 433 N.J. Super. 69, 87 (App. Div. 2013) (quoting N.J.S.A. 30:4C-15.1(a)(3)). In short, the amendments do not preclude the Division from seeking to terminate

parental rights when it is in the child's best interest.  See <u>N.J. Div. of Child Prot.</u> <u>& Permanency v. D.C.A.</u>, 256 N.J. 4 (2023).

We are also unconvinced the court placed undue weight on the resource parents' preference for adoption.  Initially, we observe a caretaker's preference to adopt is relevant, though not dispositive, in the court's analysis regarding alternatives to the TPR.  <u>N.J. Div. of Child Prot. & Permanency v. M.M.</u>, 459 N.J. Super. 246, 264 (App. Div. 2019).  Moreover, the trial court here found by clear and convincing evidence that the Division exhausted every other alternative to terminating parental rights and placing Samuel in a resource home. The court discussed the Division's reasonable efforts, including multiple different treatment services for Casey, educational and behavioral services for Samuel, and therapeutic visitation between Samuel and Casey.  Specifically, the trial court determined the Division fully considered alternatives to TPR.  The court noted:

> This court finds by clear and convincing evidence that the Division thoroughly assessed and exhausted every other alternative to [TPR] and placement of [Samuel] in [a] . . . resource home for purposes of adoption.  This included attempts to place [Samuel] with kin, as well as exploring [KLG] with known kin and even with the current non-relative resource parents versus adoption.

The court found, and the record amply supported, the Division properly and extensively explored KLG for Samuel with numerous relatives. Efforts to place Samuel with relatives continued up until the trial. Unfortunately, none of his relatives were willing or able to care for Samuel. The court also determined the Division properly explored KLG with both Samuel's relatives and with the resource parents. The resource parents ultimately decided against KLG, in favor of adoption, after being provided with information about both alternatives, which is their prerogative. The courts cannot force a KLG on resource parents. That said, we are unpersuaded by Casey's arguments that the court allowed the parents' preference to "usurp" the court's role in deciding what was in Samuel's best interest. Rather, the court properly determined the totality of the evidence presented at the trial supported a finding that termination of Casey's parental rights was in Samuel's best interest.

C.

The fourth prong of the statute requires the court to determine termination "will not do more harm than good." N.J.S.A. 30:4C-15.1(a)(4). It serves as a "'fail-safe' inquiry guarding against an inappropriate or premature [TPR]." F.M., 211 N.J. at 453 (quoting N.J. Div. of Youth & Fam. Servs. v. G.L., 191 N.J. 596, 609 (2007)). "The question ultimately is not whether a biological mother or

27                                                                    A-2300-22

father is a worthy parent, but whether a child's interest will best be served by completely terminating the child's relationship with th[e] parent." N.J. Div. of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 108 (2008). "The crux of the fourth statutory subpart is the child's need for a permanent and stable home, along with a defined parent-child relationship." N.J. Div. of Youth & Fam. Servs. v. H.R., 431 N.J. Super. 212, 226 (App. Div. 2013) (citing N.J. Div. of Youth & Fam. Servs. v. C.S., 367 N.J. Super. 76, 119 (App. Div. 2004)). "Overall, the court's focus should be on the child's need for permanency." Id. at 227 (citing M.M., 189 N.J. at 281).

"Keeping . . . child[ren] in limbo, hoping for some long[-]term unification plan, would be a misapplication of the law." N.J. Div. of Youth & Fam. Servs. v. A.G., 344 N.J. Super. 418, 438 (App. Div. 2001) (citing In re P.S., 315 N.J. Super. 91, 121 (App. Div. 1998)); see also N.J. Div. of Child Prot. & Permanency v. S.D., 453 N.J. Super. 511, 524 (App. Div. 2018) (finding "[p]arents do not have the right to extend litigation indefinitely until they are able to safely care for their children . . . ."). We have noted permanency is favored over protracted efforts for reunification. C.S., 367 N.J. Super. at 111.

Regarding prong four, the trial judge opined:

> In this case, this court finds by clear and convincing evidence that [Casey] is neither able to

safely and appropriately care for [Samuel], nor is there any realistic likelihood that she will be able to in the foreseeable future. [Casey] continues to exhibit parenting deficiencies, as well as continues to struggle with unremedied issues with domestic violence, mental health, and substance use of alcohol and over use of prescription medication. There is no proof in the trial record that a positive or healthy bond exists between [Casey] and [Samuel].

Because of [Casey's] personal instability and inconsistency in engaging in Division services as well as visitation, this court finds that it is in [Samuel's] best interest to remain in his current placement. This court finds that . . . [Samuel] has made significant progress in his current placement, including improvements in his behavior and performance in school.

The trial judge concluded:

This court finds by clear and convincing evidence that there is no evidence that any harm will occur to [Samuel] should [Casey's] parental rights be terminated. This court finds by clear and convincing evidence that [Casey] is not currently fit to parent [Samuel] and he would suffer more harm if he returned to her custody and care. It is contrary to [Samuel's] best interest to prolong the opportunity of permanency, as well as the opportunity of stability and guidance into adulthood by his current resource parents, because of [Casey's] inability and refusal to remedy the concerns that led to [Samuel's] removal.

We affirm substantially for the reasons set forth by the court. The court correctly found that the Division proved clearly and convincingly that TPR would not do more harm than good, and it is in Samuel's best interest to

terminate Casey's parental rights. The trial court's conclusion that the Division satisfied the fourth prong is well-supported by the overwhelming evidence in the record. Casey and Samuel do not have a relationship, as evidenced by Samuel requesting an end to their visitation and his acceptance that his mother cannot parent him.

Samuel is deserving of a stable and permanent home, which is now available to him as a result of his resource parents' efforts and their desire to adopt him. Casey failed to remediate the various issues that lead to Samuel's removal, he thrived in his resource home, and made significant progress with his behavior and education. The Division established that Casey has continuously failed to help herself or her son.

There was ample evidence in the record to support the trial judge's conclusion that Casey has no ability to independently parent, and termination of her relationship with Samuel will not do more harm than good. We do not question that Samuel had a positive relationship with Jenny and his siblings. That is not, however, the dispositive inquiry for the purposes of the best interest analysis. The court correctly considered Samuel's need for safety and permanency in terminating Casey's parental rights. The resource parents have

demonstrated they have provided a secure and nurturing environment for Samuel and have provided him with the stability he desperately needs.

Finally, to the extent we have not otherwise addressed any of defendant's other arguments, we determine they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2300-22